# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA,    )
            )
       v.             )     Case No.  10 CR 176-1
            )
JUAN ANTONIO LUNA, Jr.      )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Juan Luna filed a motion to (1) quash his arrest, (2) suppress evidence that law enforcement agents obtained from his truck on March 2, 2010, and (3) suppress statements he made to law enforcement following his arrest on March 2, 2010. Based on the parties' briefs, the Court determined there was a disputed issue of material fact regarding when Luna was advised of his *Miranda* rights. The Court convened a suppression hearing on January 28, 2011 to address this limited issue.[1] *See United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007) (on a motion to suppress "[e]videntiary hearings are not required as a matter of course; a district court need conduct a hearing only when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion.") (citing *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004)); *see also United*

---

[1] Based on Luna's briefs, it appeared there might have been a second disputed issue of material fact regarding whether Luna consented to the search of his semi-truck. The Court instructed Luna to clarify his position on the issue via a written submission, which he did. *See* R. 114, Supplemental Declaration of Juan Antonio Luna Jr. Based on Luna's supplemental submission, in which Luna did not contest that he had consented to the search of his semi-truck on the roadside of I-70, the Court determined that there was no disputed issue of material fact regarding Luna's consent to search. Nevertheless, the Court did permit the parties to explore the issue at the January 28, 2011 suppression hearing.

*States v. Juarez*, 454 F.3d 717, 720 (7th Cir. 2006). The Court further determined that it could address the remaining issues based on the briefs given that Defendant did not raise factual disputes as to them.

At the suppression hearing, the government presented documentary evidence and four witnesses testified credibly: Kansas Highway Patrol Troopers Christopher Nicholas and Brian K. Smith, and Drug Enforcement Agency Special Agents Dana Suchma and Michael Wilhite. Each of those officers interacted with Defendant Luna on March 2-3, 2010 and has extensive experience in both law enforcement and drug interdiction.[2] After carefully examining the evidence presented in connection with Defendant's motion, including the demeanor and credibility of the witnesses who testified during the suppression hearing, the Court denies Defendant's motion.

## FACTUAL BACKGROUND[3]

### I. Kansas Highway Patrol Stop On Interstate 70

On the morning of March 2, 2010, Kansas Highway Patrol ("KHP") Trooper Nicholas was patrolling Interstate 70 near Topeka, Kansas. At approximately 9:54 a.m., Trooper Nicholas

---

[2] KHP Trooper Nicholas has been employed as a KHP Trooper for ten years. He has received drug enforcement training through state and federal agencies. Prior to March 2010, KHP Trooper had participated in more than 80 roadside narcotics seizures. KHP Trooper Smith has been employed as a KHP Trooper since 1998, and was employed as a DEA Task Force Officer for more than two years. Trooper Smith has received federal and state drug enforcement training, and has participated in upwards of 200 narcotics seizures involving 15,000 pounds of marijuana and more than 500 pounds of cocaine. DEA Special Agent Suchma is a member of the Kansas City Interdiction Task Force. DEA Special Agent Wilhite works in Chicago and is the case agent assigned to this criminal case.

[3] The Court makes the following factual findings based on the parties' submissions, which include a video recording of the KHP Trooper Nicholas's stop of Defendant Luna, *see* R. 61, Def.'s Mot., at Attachment 2 ("Video Recording").

observed a commercial semi-truck traveling eastbound on I-70 and ran a check of the United States Department of Transportation ("DOT") number identified on the side of the semi-truck.[4] The DOT number did not yield a "match" in the database. Trooper Nicholas activated his emergency lights and directed the semi-truck to the side of the road. As the semi-truck pulled over, Trooper Nicholas observed an irregular lock on the trailer door that he recognized as a cable lock designed for firearms.

Trooper Nicholas approached the driver of the semi-truck, who identified himself as Juan Antonia Luna, Jr. ("Luna" or "Defendant"). Upon Trooper Nicholas's request, Luna produced identification and a copy of the bill of lading.[5] Trooper Nicholas asked Luna about the trucking company for which he drove, and Luna stated that it was his own company. Trooper Nicholas informed Luna that the DOT number displayed on his semi-truck had not appeared in his computer database search, but suggested that perhaps it was because DOT numbers for new trucking companies are not always immediately reflected in the database. Trooper Nicholas asked Luna where the cargo had been loaded onto the semi-truck, and Luna named two cities, one in California and the other in Arizona. Luna's answer did not match the information on the bill of lading. Trooper Nicholas next inquired as to where Luna was delivering the cargo. Again, Luna's answer did not match the bill of lading.

---

[4] Companies that operate commercial vehicles that haul cargo in interstate commerce must register with the Federal Motor Carrier Safety Administration and must have a DOT number. Under Kansas law, all commercial vehicles traveling on the Kansas roadways must have a valid DOT number displayed on the vehicle.

[5] Under federal and Kansas law, commercial motor vehicle operators must keep bills of lading documenting, among other things, a description of the cargo, where the cargo originated, and where it is being delivered. 49 C.F.R. § 373.101.

Trooper Nicholas asked Luna for his driver's log book.[6]  Luna produced the log book, but noted that there were some problems with it because of a truck inspection he had been subjected to in New Mexico.  Trooper Nicholas examined the log book and noted that Luna had driven the semi-truck for significantly fewer hours than the number of hours permitted under federal safety regulations.

Trooper Nicholas informed Luna that he had noticed the gun lock on the trailer door.  Luna explained that he had flown with the gun lock in his luggage.  When Trooper Nicholas expressed confusion, Luna informed Trooper Nicholas that he had flown to Phoenix, where the semi-truck was parked before Luna began driving it.  Luna informed Trooper Nicholas that it was his first trip.  Luna also noted that he had not personally loaded the produce into the truck, which prompted Trooper Nicholas to ask to look at the load.  Luna unlocked the gun lock and opened the back door of the trailer for Trooper Nicholas.  Inside, the produce was stacked in such a way that it nearly reached the ceiling and the back door of the trailer.  Trooper Nicholas removed inspection equipment from his vehicle and examined the load.  He observed that the load from California was in the front and the back of the trailer, while the Arizona load was in the middle of the trailer.  Trooper Nicholas inquired about the irregular loading of the cargo and Luna stated that someone else had loaded the trailer in Arizona.

Approximately twenty-three minutes into the stop, Trooper Nicholas asked Luna if the truck contained anything illegal.  Luna answered "no."  Trooper Nicholas asked Luna for

_____

[6]  Under federal and Kansas law, any person who drives a commercial motor vehicle is subject to federal safety regulations and must complete an accurate record of duty status ("daily log book") which records, among other things, the length of time (s)he has driven, the number of miles driven, and the stops made.  49 C.F.R. § 395.8.

consent to search the semi-truck, and Luna consented.[7]  Trooper Nicholas searched the driver's cabin and observed three cell phones.  Trooper Nicholas noted that there was very little clothing, and no scale or weight tickets.  Trooper Nicholas also noted a power drill and an extension with a socket on it, which he observed appeared to have been recently used.

Nineteen minutes after obtaining Luna's consent to search the semi-truck, Trooper Nicholas returned to his patrol car and asked the KHP dispatch to run a computer check of Luna's driver's license and criminal history.  Trooper Nicholas learned that Luna's driver's license was valid, that the semi-truck was lawfully registered, and that Luna had no criminal history.  Trooper Nicholas called another officer to discuss the situation.  Following that conversation, which was not recorded on the video, Trooper Nicholas returned to the semi-truck and directed Luna to drive to a nearby public rest stop so that Trooper Nicholas could complete the search of the semi-truck.  When Trooper Nicholas gave this direction to Luna, he noticed a small hacksaw and a set of "Torx bits" (screwdriver heads) in the cabin that appeared freshly used.  Luna voiced a concern about "being late" but complied with Trooper Nicholas's request.  Luna drove the semi-truck to the rest stop unaccompanied.  Following him, en route to the rest stop, Trooper Nicholas spoke on the phone with one of his colleagues and made repeated comments about the suspicious nature of Luna's conduct.

A KHP truck containing x-ray technology (a "backscatter truck") arrived at the rest stop

---

[7]  The Court again notes, for clarity, that Luna does not contest that he consented to Trooper Nicholas's search of his semi-truck.  *See supra* note 1.  Even if Luna had contested the government's assertion that Luna consented to the search, however, the Court would find that Luna consented.  The Court makes that factual finding based on its observation of the conversation between Luna and Trooper Nicholas on the Video Recording, as well as on the Trooper Nicholas's credible testimony at the January 28, 2011 suppression hearing.

and scanned the exterior of the semi-truck.[8]  According to the scan, a concealed compartment in the driver's cabin contained thirty-two packages.  After inspecting the driver's cabin and confirming the existence of the concealed compartment, the KHP officers arrested Luna and placed him in handcuffs.  Approximately five minutes later, the KHP officers removed Luna's handcuffs and ordered him to drive the semi-truck to KHP Troop B Headquarters ("Troop B") in Topeka, Kansas.  KHP Trooper Brian Smith rode with Luna to Troop B.  They did not discuss the contents of the hidden packages during the drive.  When they arrived at Troop B, law enforcement agents searched the concealed compartment and discovered thirty-two individually wrapped one-kilogram packages which, when sampled, tested positive for cocaine.

## II.     Luna's Interviews With Law Enforcement

Following Luna's arrival at Troop B, at approximately 1:30 p.m., DEA Task Force Officer Brian Hogelin and DEA Special Agent Dana Suchma interviewed Luna.  It is undisputed that during the course of those communications, Luna made incriminating statements regarding the thirty-two kilograms of cocaine that were hidden in the concealed compartment of his semi-truck.  Among other things, Luna confessed that he was transporting the cocaine from the Los Angeles area to the Chicagoland area, and that he was working with other individuals.  At approximately 5:15 p.m., Luna signed a "Written Waiver of Rights To Be Taken Before A Federal Magistrate And To Have Counsel," *see* R. 70-4, in which he stated that he would immediately cooperate with the DEA.  The Waiver further stated that Luna did not want to talk to a lawyer until after his cooperation with the DEA.  Luna signed a Confidential Source Agreement with the DEA at approximately 5:36 p.m., *see* R. 70-5, and agreed to carry out a

---

[8]  The Video Recording ends when the semi-truck arrives at the rest stop.

controlled delivery of the thirty-two kilograms of cocaine to his intended purchaser in Chicago.

Law enforcement officials transported Luna and his truck to the Chicago area that night. In

transit, Luna made multiple telephone calls – some of which were consensually recorded –

regarding the controlled delivery.

On March 3, 2010, at approximately 8:03 a.m., after arriving in Chicago, Luna met with

DEA Special Agent Michael Wilhite and signed an "Illinois State Police Statement of

Constitutional Rights and Waiver Rights," waiving his *Miranda* rights. *See* R. 70-6.

Immediately thereafter, federal agents from the Chicago area interviewed Luna. The controlled

delivery occurred at approximately 7:40 p.m.

The parties disagree on a significant factual issue: namely, whether and when law

enforcement agents Mirandized Luna. Luna denies that anyone advised him of his *Miranda*

rights in Kansas. Luna alleges that the first time he was read his *Miranda* rights was when he

met with Special Agent Wilhite in Chicago. According to the government, KHP Trooper Smith

advised Luna of his *Miranda* rights at approximately 11:43 a.m. on March 2, 2010, when Luna

arrived at Troop B, and Luna waived those rights. The government further contends that when

Task Force Officer Hogelin and Special Agent Suchma interviewed Luna at Troop B, they first

conferred with Trooper Smith to confirm that he had advised Luna of his *Miranda* rights, and

that Trooper Smith so confirmed. The government rejects Luna's claim that he was not

Mirandized prior to arriving in Chicago. Because the Court found this disagreement to

constitute a "significant, disputed factual issue" that required resolution, *see United States v.*

*Martin*, 422 F.3d 597, 602 (7th Cir. 2005) ("Evidentiary hearings are necessary only when the

party requesting the hearing identifies a significant, disputed factual issue that must be

resolved"), it held a limited hearing on this issue on January 28, 2011.

## ANALYSIS

Luna argues that the Court should quash his arrest and suppress evidence and statements that he made to law enforcement agents on March 2-3, 2010 because (1) his detention on Interstate 70 was unlawful, (2) his statements to Trooper Nicholas were not voluntarily and intelligently made, (3) "there is no direct evidence that Luna was ever advised of his Miranda rights" at Troop B, and (4) Luna's post-arrest statements were "coerced by police threats and induced by police promises," and therefore were not freely or voluntarily given in violation of his rights under the Fifth and Sixth Amendments.  The government refutes Luna's allegations and argues that (1) Trooper Nicholas lawfully stopped Luna on I-70, (2) Luna's pre-arrest statements to Trooper Nicholas were voluntarily and intelligently made, (3) although Luna was not asked to sign a *Miranda* waiver form at the time of his initial *Miranda* warnings at Troop B, he was mirandized by Trooper Smith at Troop B, waived his *Miranda* rights, and signed several other waivers and forms expressing his desire to cooperate with the DEA and waive his right to counsel until after his cooperation had concluded, and (4) Luna's claims are belied by the waivers he signed which clearly set forth the terms of his cooperation agreement, including the plain language that Luna was facing federal charges and that no promises would be made in exchange for his cooperation.  The Court addresses each of Defendant's arguments in turn.

## I.     The Encounter On Interstate 70

Luna argues that the encounter on I-70 consisted of two separate and legally distinguishable stops, both of which violated his Fourth Amendment rights.  The "first" stop, according to Luna, began when Trooper Nicholas directed Luna to pull over on the shoulder of I-

70. The "second" stop began when Luna arrived at the rest stop. As discussed below, the Court

rejects Luna's proffered "two stop" framework and finds that Trooper Nicholas's stop and

subsequent search of Luna's semi-truck did not violate Luna's constitutional rights.

### A. The initial pull-over on Interstate 70 did not violate Luna's Fourth Amendment rights

Luna contends the initial roadside pull-over on Interstate 70 violated his Fourth

Amendment rights.[9] In response, the government makes two arguments. First, the government

argues that Trooper Nicholas had regulatory authority under Kansas law to conduct an

administrative search of Luna's truck. Second, the government argues that Trooper Nicholas

had reasonable suspicion to conduct a *Terry* stop of Luna's vehicle. The Court agrees.

### 1. Trooper Nicholas had regulatory authority to stop and search Luna's truck

Kansas law authorizes KHP officers to conduct warrantless administrative stops and

inspections of commercial motor vehicles. Specifically, the Kansas statute provides:

> (a) The superintendent and members of the Kansas highway patrol are hereby vested with the power and authority of peace, police and law enforcement officers anywhere within this state irrespective of county lines.

> (b) In addition to the general power and authority prescribed by subsection (a), the superintendent and members of the Kansas highway patrol are hereby authorized and

---

[9] In his six-page motion to suppress, Luna makes a blanket assertion that the initial stop on I-70 was unlawful, without developing any legal arguments or citing to any supporting statutes or case law. *See* R. 61, Def.'s Mot. Luna only makes specific legal arguments in his reply brief, in response to the government's contentions that the initial stop was authorized both by Kansas law and under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The remaining arguments in Luna's motion are likewise bare-boned assertions; the legal arguments, to the extent Luna makes them, come only in his reply brief to the government's consolidated response. Although arguments raised for the first time in a reply brief are waived, *United States v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008) (citations omitted), the Court will address the substance of these arguments for completeness.

directed to execute and enforce the laws of this state relating to public and private motor carriers of passengers or property, including any rules and regulations relating to such laws, and shall have the power and authority to require the driver of any motor vehicle owned or operated by any such carrier to stop and submit such vehicle to an inspection to determine compliance with such laws and rules and regulations.

K.S.A. 74-2108 (2009).  "[A] regulatory inspection is not premised on an officer's on-the-spot perception that he has an individualized suspicion that the specific individual to be seized and searched is involved in criminal activity."  *United States v. Herrera*, 444 F.3d 1238, 1246 (10th Cir. 2006).  Rather, an administrative search is "premised on the individual subject to the warrantless seizure and search knowingly and voluntarily engaging in a pervasively regulated business, and on the existence of a statutory scheme that puts that individual on notice that he will be subject to warrantless administrative seizures and searches."  *Id*.

Federal and state courts in Kansas have uniformly held that commercial vehicles and motor carriers are a "closely" or "pervasively" regulated industry that may be subject to warrantless inspections.  *See United States v. Gwathney*, 465 F.3d 1133, 1138 (10th Cir. 2006) (citing *United States v. Burch*, 153 F.3d 1140, 1141-43 (10th Cir. 1998)); *V-1 Oil Co. v. Means*, 94 F.3d 1420, 1426 (10th Cir. 1996); *State v. Moore*, 237 Kan. 523, 528, 701 P.2d 684 (Kan. 1985).  Luna does not contest this.  Nor does Luna contest that Kansas law put him on notice that he could be subject to warrantless administrative searches and seizures.  Instead, Luna argues that Trooper Nicholas's conduct improperly exceeded the Fourth Amendment limitations on a warrantless administrative search in violation of *New York v. Burger*, 482 U.S. 691, 702-03, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (setting forth a three-part test to determine whether a warrantless inspection in a closely regulated business is reasonable).  Specifically, Luna challenges the "considerable time" Trooper Nicholas took to question him, to inspect his records

and documents, and to search the interior of the semi-truck; Trooper Nicholas's failure to cite

Luna for any violations; and Trooper Nicholas's decision to direct Luna to the rest stop and there

employ the "backscatter" truck. (Reply at 4.) Because the Court finds that Trooper Nicholas

also had reasonable suspicion to detain Luna and conduct a warrantless search of Luna's semi-

truck, *see infra* Parts I.A.2., I.B., the Court need not determine whether Trooper Nicholas's

actions *subsequent* to the initial pull-over were within his regulatory authority under Kansas law.

"The *Burger* criteria apply to a regulatory scheme generally, not to the particular search

at issue." *United States v. Gwathney*, 465 F.3d 1133, 1139-40 (10th Cir. 2006) (internal citation

omitted). "In other words, the *Burger* criteria are applied generally to a statutory scheme, not to

a given set of facts arising under that scheme." *Id.* (internal citation omitted). Beyond

challenging the bounds of Trooper Nicholas's search, Luna does not challenge the

constitutionality of the Kansas regulatory scheme under *Burger*.[10]

---

[10] The Court notes that without exception, federal and state courts in Kansas have found that the regulatory scheme set forth in Kansas Statute 74-2108(b) satisfies all three prongs of the *Burger* test. *See United States v. Mercado-Nava*, 486 F. Supp. 2d 1271, 1275 (D.Kan. 2007); *United States v. Rios-Pinela*, No. 06-40073-01-SAC, 2006 WL 2710330, at *4 (D.Kan. 2006) (holding that "the Kansas regulatory scheme [K.S.A. 74-2108(b)] satisfies the *Burger* three-part test"); *United States v. Burch*, 906 F. Supp. 592, 598 (D.Kan. 1995) (relying on *Williams* to hold that a regulatory stop under K.S.A. 74-2108(b) is valid and constitutional); *State v. Krum*, 270 Kan. 870, 877, 19 P.3d 172 (Kan. 2001) ("We hold, as we did in *Williams* and *Moore*, that K.S.A. 74-2108(b) is and remains constitutional under the Fourth Amendment and clearly passes the *Burger* analysis."); *Williams*, 8 Kan.App.2d at 20, 22 (finding that "the public has substantial interests that are in need of protection" and concluding that "the warrantless search authorized by K.S.A. 74-2108(b) for the purpose of inspecting any records or documents required to be maintained and kept in the truck cab, and to check for required safety equipment, is not unreasonable under the Fourth Amendment."). The Tenth Circuit has not had to definitively rule as to whether Kansas Statute 74-2108(b) satisfies the *Burger* test: either the appellants in those cases have conceded the point, *see, e.g., Herrera*, 444 F.3d 1244-45 ("In this case, Herrera does not challenge the constitutional validity of the Kansas statutory scheme regulating motor carriers; nor does he challenge the trooper's authority under that scheme to stop vehicles subject to that regulation for random inspection."); *United States v. Burch*, 153 F.3d 1140, 1142 (10th

Trooper Nicholas, as a member of the KHP, is responsible for, among other things, enforcing commercial motor vehicle laws. K.S.A. 74-2108(b). As federal and state courts in Kansas have all held, Trooper Nicholas was authorized to conduct a random, warrantless search of Luna's motor vehicle when he saw Luna driving on Interstate 70. *See* cases cited *supra* note 10. Trooper Nicholas did not need individualized suspicion that Luna was involved in criminal activity to effectuate that warrantless search. *Herrera*, 444 F.3d at 1246. Luna concedes in his reply brief that Trooper Nicholas's decision to pull Luna's semi-truck to the side of I-70, to ask Luna questions about his trucking company, his cargo, and his driving route, and to inspect Luna's bill of lading, driver's log book, and shipping papers, was proper under Kansas law. (Reply at 3, "As construed by the courts, [K.S.A. 74-2108] would have authorized Nicholas to conduct a warrantless search to inspect records, documents, and safety equipment."). The Court finds that Trooper Nicholas acted within his authority under K.S.A. 74-2108 in directing Luna's semi-truck to the side of Interstate 70 for the purposes of conducting an administrative search.

### 2. Trooper Nicholas also had reasonable suspicion to effectuate a *Terry* stop of Luna's semi-truck

Based on the documentary and testimonial evidence submitted to the Court, Trooper Nicholas also had reasonable suspicion to effectuate an investigatory stop of Luna's semi-truck. The undisputed facts show that Trooper Nicholas directed Luna to the shoulder of I-70 after he

---

Cir. 1998) ("Defendant does not dispute that searches pursuant to [K.S.A. 74-2108] meet the test for a valid regulatory search set forth in [*Burger*]."), or the facts of the case did not lend themselves to the analysis, *see, e.g., United States v. Seslar*, 996 F.2d 1058, 1063 n.3 (10th Cir. 1993) (where the government defended a KHP trooper's warrantless search on the basis of his regulatory authority under Kansas law, but the defendants were driving a rental van and not a motor carrier, the court said in dicta that "[f]or purposes of this case, we assume, without holding, that ... the Kansas regulatory scheme satisfies the *Burger* test.").

ran the DOT number on Luna's semi-truck through his computer database and received no matches. The fact that Luna's semi-truck contained an invalid DOT number gave Trooper Nicholas reasonable suspicion that Luna was operating a truck in violation of state law and federal regulations. As Trooper Nicholas parked his patrol car behind the semi-truck, he observed a gun lock being used to secure the truck's trailer – something that, in Trooper Nicholas's training and experience, was uncommon in the trucking industry.

Law enforcement officers are permitted to conduct investigatory stops "if the officer making the stop is 'able to point to specific and articulable facts' that give rise to a reasonable suspicion of criminal activity." *United States v. Tilmon*, 19 F.3d 1221, 1224 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "Reasonable suspicion is a lower threshold than probable cause and does not deal with hard certainties, but with probabilities." *United States v. Booker*, 579 F.3d 835, 839 (7th Cir. 2009). It "requires more than a hunch but less than probable cause and considerably less than a preponderance of the evidence." *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (quotation omitted). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006); *see also United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995). Based on the totality of the circumstances known to Trooper Nicholas, including the two observations he made before he approached the driver's side door of Luna's semi-truck, Trooper Nicholas had reasonable suspicion that Luna was engaging in unlawful conduct. The interaction that ensued bolstered that reasonable suspicion.

**B.**     **Trooper Nicholas had reasonable suspicion to extend the roadside stop on Interstate 70**

Luna argues that his Fourth Amendment rights were violated during the roadside detention because of the "considerable time" Trooper Nicholas took to question Luna, to inspect his records and documents, and to search the interior of the semi-truck. Based on its review of the relevant factors, the Court disagrees.

A proper traffic stop can run afoul of the Fourth Amendment if the manner of executing the seizure unreasonably infringes interests protected by the Constitution. *United States v. Taylor*, 596 F.3d 373, 376 (7th Cir. 2010) (citations omitted). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Information lawfully obtained during a traffic stop may, however, provide the law enforcement agent with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation. *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005); *United States v. Muriel*, 418 F.3d 720, 725 (7th Cir. 2005). To determine the reasonableness of the length of detention, courts consider the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the law enforcement agent diligently pursued his investigation. *United States v. Bullock*, – F.3d –, 2011 WL 292021, at *19 (citing *United States v. Sharpe*, 470 U.S. 657, 685-87 (1985)). "There is no rigid time limit" that transforms a reasonable detention into an unreasonable, and thus unconstitutional, detention. *Id.*; *see also United States v. Place*, 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (declining to adopt a rigid time limitation because it "would undermine the [] important need to allow authorities to graduate

their responses to the demands of any particular situation"). Rather, "common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685.

The Court finds no evidence that Trooper Nicholas unreasonably prolonged his stop of Luna. To the contrary, based on the Court's review of the parties' submissions, including the videotape of Trooper Nicholas's interaction with Luna, the Court finds that Trooper Nicholas acted diligently in conducting the investigation. Immediately after directing Luna to the shoulder of I-70, Trooper Nicholas asked Luna about the semi-truck's DOT registration number and gathered information about Luna's ownership of the trucking company. Trooper Nicholas inspected the bill of lading and the driver's log, and made appropriate follow-up inquiries that Luna answered with inconsistent and at times illogical explanations. Those explanations naturally invited additional questions. Based on Trooper Nicholas's experience and training as a KHP officer, Luna's answers raised red flags. Specifically, the sporadic hours Luna had driven were not appropriate for the perishable cargo of fresh produce he was allegedly hauling. Contrary to industry practice, Luna had not loaded the cargo himself. Rather, he told Trooper Nicholas that he had slept while other individuals had loaded it. The cargo was organized in an irregular manner, and was stacked to the ceiling, preventing the air circulation that cargo loads of perishable produce require. In addition, because of his experience and training, Trooper Nicholas knew that the locations where Luna's cargo had been loaded – California and Arizona – are "source areas" for narcotics shipments. All of these factors prompted Trooper Nicholas to ask Luna whether he had anything illegal in the truck. That question came twenty-three minutes into the stop – a duration the Court finds reasonable, despite Luna's unsupported assertion to the contrary. *See, e.g., Jewett v. Anders*, 521 F.3d 818, 827 (7th Cir. 2008) (finding that a 30-45

minute investigatory stop was reasonable) (collecting cases).  In the course of his search, Trooper Nicholas made additional observations that heightened his suspicion that Luna was engaging in narcotics trafficking -- Luna had very little clothing in the cabin of the truck, he possessed three cell phones, and he also possessed a drill that appeared newly used.

Luna argues that some of these observations were insufficient to support reasonable suspicion.  *See* Def.'s Reply at 6 ("Nicholas's observation of 3 cell phones was 'weak' evidence. ... So, too, the fact Luna may have told inconsistent stories.").  The Seventh Circuit has repeatedly held, however, that even when innocent explanations exist for individual factors taken separately, reasonable suspicion may arise when the factors are considered together.  *See United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) ("[B]ehavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play."); *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996) (finding that factors considered separately may have innocent explanations, but give rise to reasonable suspicion when viewed in combination).  In light of all of the information available to Trooper Nicholas during the course of the initial traffic stop, it was not unreasonable for him to suspect that Luna was engaging in criminal conduct.  *See United States v. Figueroa-Espana*, 511 F.3d 696, 703 (7th Cir. 2007).  Nor was it unreasonable for Trooper Nicholas to continue the investigatory stop to investigate this suspicion.  Considering the totality of the circumstances at the time of the encounter, *see United States v. Jackson*, 300 F.3d 740, 745-46 (7th Cir. 2002), and Trooper Nicholas's background and training in these matters, Trooper Nicholas's actions were supported by reasonable suspicion and the extension of the roadside stop did not violate Luna's Fourth Amendment rights.

## C.     Luna voluntarily consented to a search of his semi-truck

When Luna denied having anything illegal in the truck, Trooper Nicholas asked Luna for consent to search the semi-truck.  Luna consented.  During Trooper Nicholas's search, he asked Luna additional questions about his route.  Luna's answers continued to be inconsistent and vague.  Trooper Nicholas ultimately informed Luna that he wanted to relocate the search to a rest stop close by.  Luna made a comment about "being late," but when Trooper Nicholas noted that Luna was "already late," Luna agreed to relocate and drove the semi-truck to the rest stop down the road.[11]  There, they were met by additional KHP officers, including two who had arrived in a "backscatter" truck containing x-ray technology.  The KHP officers used the backscatter truck to scan the exterior of Luna's semi-truck.  It is undisputed that Luna never withdrew his consent to search the truck.  Nor did he object to the KHP officers' scan of his truck.  The scan revealed the presence of thirty-two packages, hidden in a concealed compartment in the driver's cabin.  After confirming the existence of the concealed compartment, the KHP officers arrested Luna and transported him, in his semi-truck, to Troop B.  There, KHP officers opened the concealed compartment and retrieved thirty-two individually wrapped one-kilogram packets of cocaine. Luna now argues that the KHP officers' use of a backscatter truck to conduct a warrantless search of his semi-truck violated his Fourth Amendment rights.  Luna also contends that he "never gave [the KHP officers] permission to go inside the walls of [his] truck."  (R. 114, Supplemental Declaration of Juan Antonio Luna, ¶ 8.)

---

[11]  Luna argues that Trooper Nicholas violated Luna's Fourth Amendment rights when he moved the investigation to the rest stop.  The Court disagrees, for the same reasons the Court cited in finding Trooper Nicholas's investigation on the shoulder of I-70 to be constitutional. Namely, Trooper Nicholas reasonably suspected that Luna was engaged in criminal conduct.

The Fourth Amendment's warrant requirement does not apply in circumstances where an authorized party voluntarily consents to a search. *United States v. Pineda-Buenaventura*, 622 F.3d 761, 766 (7th Cir. 2010); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Whether a defendant voluntarily consented to a search is a question of fact determined by examining the totality of the circumstances. *United States v. Lewis*, 608 F.3d 996, 999 (7th Cir. 2010). To make this determination, the Court considers (1) the defendant's age, intelligence, and education; (2) how long the defendant was detained prior to giving consent; (3) whether the consent was immediate, or was prompted by repeated requests by law enforcement agents; (4) whether coercion was used; (5) whether the defendant was in custody; and (6) whether the defendant was advised of his right to refuse to consent. *United States v. Risner*, 593 F.3d 692, 694 (7th Cir. 2010). In a totality of the circumstances analysis, no single factor is determinative. *Schneckloth*, 412 U.S. at 227. The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *Id.* at 222; *see also United States v. Saadeh*, 61 F.3d 510, 517 (7th Cir. 1995).

As the government describes in its response brief, and as the Court independently observed in its review of the Video Recording, Luna consented to the search of his semi-truck twenty-three minutes after the stop began. Luna was not in custody when he consented, and Trooper Nicholas did not threaten or coerce him in any way. The Court agrees with the government's characterization that Luna "did not hesitate in providing consent" when Trooper Nicholas requested it, and that "his demeanor at the time of his consent was consistent with his demeanor throughout the stop," *see* R. 70, Govt's Consolidated Resp. at 16. Trooper Nicholas's credible testimony at the January 28, 2011 suppression hearing corroborated this. Based on the

Court's observation, Luna was polite and cooperative to the request for consent, and to Trooper Nicholas's questions generally. Luna was a 26-year old adult at the time of the stop, and does not allege that his age, education, or intelligence rendered his consent involuntary. Based on an examination of the totality of the circumstances surrounding Luna's consent, the Court finds that Luna freely and voluntarily consented to a search of his semi-truck. Because the Court so finds, "[t]he Fourth Amendment's warrant requirement does not apply," *Pineda-Buenaventura*, 622 F.3d 766, and the search did not implicate Luna's Fourth Amendment rights.

Nevertheless, Luna argues that the "second" warrantless search – i.e. the use of the backscatter truck at the rest stop warrantless search – was unconstitutional. (Def.'s Reply at 5.) Luna argues that the KHP officers' use of x-ray technology to scan his "home while on the road" was presumptively unreasonable without a warrant under *Kyllo v. United States*, 533 U.S. 27, 40, 127 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Additionally, Luna disputes that he consented to that search. (Def.'s Reply at 8.) Luna bases his argument, at least in part, on the fact that Trooper Nicholas "did not tell Luna that he could refuse" that search. (*Id*. at 5.)

Law enforcement agents are not constitutionally required to advise criminal defendants of their right to refuse a search before procuring their consent, *see United States v. Saadeh*, 61 F.3d 510, 517 (7th Cir. 1995) (citation omitted), and Luna cites no case law that suggests otherwise. Thus, the fact that Trooper Nicholas did not inform Luna that he could refuse Trooper Nicholas's request for consent to search is of no consequence. *Id*. Furthermore, "[a] lawful search of fixed premises generally extends to the entire areas in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *Id*. (quoting *United States v. Ross*, 456 U.S. 798, 820-

21, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)); *see also Jackson*, 598 F.3d 340, 349 (7th Cir. 2010)

("Where someone with actual or apparent authority consents to a general search, law

enforcement may search anywhere within the general area where the sought-after item could be

concealed.").  Beyond Luna's bare assertion in his reply brief that he did not consent to the

search, *see* Def.'s Reply at 8 ("As mentioned, Luna did not consent to this search"), there is no

indication that Luna ever objected to the search of his semi-truck.  For the avoidance of doubt,

the Court explicitly requested that Luna clarify his position on this matter in writing.  *See* R. 108

(Minute Entry).  Nowhere in Luna's Supplemental Declaration, filed in response to the Court's

direction, does Luna state that he ever objected, in any way, to the search of his semi-truck.  *See*

R. 114.  Nor does Luna allege that he ever limited the scope of his consent.  All of the

information submitted to the Court, including the credible testimony presented by KHP Troopers

Nicholas and Smith at the January 28, 2011 suppression hearing, indicates that Luna made no

objections, at any point, to the fact or scope of the KHP officers' search of his semi-truck.

Trooper Nicholas credibly testified that Luna was cooperative and immediately consented to the

search of his semi-truck on the side of I-70.  Trooper Smith credibly testified that he never saw

Luna object to the KHP officers' use of the backscatter truck and, moreover, that Luna watched

the troopers search his semi-truck, stood by quietly, and made no objection.  *United States v.*

*Saadeh*, 61 F.3d 510, 518-19 (7th Cir. 1995).  The Court finds Luna's consent to have been

knowing and voluntary.  As such, the KHP officers' warrantless search of Luna's truck

withstands constitutional scrutiny.  Luna's remaining argument, invoking *Kyllo*, is thus moot.

### D.     The *Terry* stop did not exceed the bounds of an investigative stop

In his reply brief, Luna argues for the first time that the nature of his roadside detention

on I-70 transformed it into a formal arrest. Luna asserts that Trooper Nicholas lacked probable cause to effectuate this formal arrest, and that Trooper Nicholas accordingly violated his Fourth Amendment rights. Arguments raised for the first time in a reply brief are waived. *United States v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008) (citations omitted). Furthermore, Luna contradicts this argument in his opening brief, *see* R. 61, Def.'s Mot. at 2, 4 (representing that Luna's arrest occurred after the KHP officers discovered thirty-two packages hidden in a concealed compartment), as well as in the final pages of his reply brief, *see* Def.'s Reply at 9 ("Following the second warrantless search, Luna was arrested.").

Even if Luna had properly raised this argument in his opening brief, however, he would not prevail. An arrest occurs when "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on the freedom of movement of the degree which the law associates with a formal arrest." *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). Luna attempts to make this legal argument in his Supplemental Declaration, *see* R. 114 at ¶¶ 2, 3 ("I did not feel free to leave"). The proper analysis the Court must undertake, however, is how a "reasonable person in the suspect's position" would have understood the situation. *Ienco*, 182 F.3d at 523. The Court must consider the totality of the circumstances in order to make this determination. *See United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994).

"Given the 'endless variations in the facts and circumstances,' there is no 'litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop' and becomes an arrest." *Bullock*, 2011 WL 292021, at *9 (quoting *Dunaway v. New York*, 442 U.S. 200, 212-16, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). In *Bullock*, the Seventh Circuit found that it would be

reasonable to handcuff a suspect and detain him in a squad car while conducting an investigation for narcotics. *Id*. at *10. That did not occur here. In *Bullock*, the Seventh Circuit referenced other cases in which it had held that officers' conduct was "not tantamount to an arrest," including situations where officers transported a suspect from one location to another, where the officers drew their weapons, and where the officers detained a suspect in a patrol car for more than an hour before arresting him. *Id*. (citing cases). Nothing close to these circumstances occurred in the present case. Trooper Nicholas never physically restrained Luna in any way – at no point did he handcuff Luna or detain Luna in his squad car. Trooper Nicholas never physically threatened Luna or made any show of force with his service weapon. Even when Luna proceeded to the rest stop for further investigation, he drove unaccompanied. At the rest stop, Luna remained similarly free from restraint – during the backscatter truck scan of his semi-truck, none of the KHP officers handcuffed or otherwise detained Luna. He stood in the parking lot and observed the search, without protest. Considering the events that occurred in this case through the lens of the abundant Seventh Circuit case law on this topic, the Court finds that the investigatory stop did not transform into a formal arrest.

## II. Luna's Statements To Law Enforcement

Luna argues that "there is no direct evidence that Luna was ever advised of his *Miranda* rights" when he was questioned by state and federal law enforcement agents in Kansas on March 2, 2010. (Def.'s Mot. at 5.) The government refutes Luna's assertion, and states that KHP Trooper Smith advised Luna of his *Miranda* rights when Luna arrived at Troop B. The government further asserts that DEA Task Force Officers confirmed that Luna had been Mirandized before speaking with Luna at Troop B. Because this constituted a "significant,

disputed factual issue that must be resolved," *see United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (citation omitted), the Court conducted a suppression hearing on January 28, 2011 in order to make evidentiary determinations. Based on the credible testimony of the law enforcement officers, the Court finds that Trooper Smith read Defendant Luna his *Miranda* rights at Troop B, and that the DEA agents confirmed this fact with Trooper Smith before interviewing Luna.

The government presented testimony from four law enforcement agents. Trooper Smith testified that he advised Luna of his *Miranda* rights when he arrived at Troop B on March 2, 2010, before the law enforcement officers questioned him. Trooper Smith stated that he read Luna his *Miranda* rights off a wallet-sized *Miranda* card, a copy of which the Court accepted into evidence as Government Exhibit Smith 2. Trooper Smith testified that he asked Luna if he understood his rights, and that Luna assented. Trooper Smith further testified that at no time during their subsequent conversation did Luna attempt to invoke his rights. Trooper Smith memorialized the *Miranda* warning in writing on a Kansas Standard Arrest Report, *see* Government Exhibit Smith 3, which he gave to Trooper Nicholas for use in preparing Luna's official arrest report. The Kansas Standard Arrest Report indicates that Trooper Smith mirandized Luna at 11:43 a.m. Trooper Smith testified that he did not have Luna sign a written *Miranda* waiver form because, to his knowledge, the KHP does not have such a form. Lastly, Trooper Smith testified that the DEA agents who came to interview Luna first conferred with him as to whether Luna had been Mirandized. Trooper Smith confirmed to those agents that Luna had waived his *Miranda* rights. DEA Special Agent Suchma corroborated Trooper Smith's account in his testimony, stating that prior to interviewing Luna, he spoke with Trooper Smith to

ensure that the KHP Troopers had Mirandized Luna so that he and DEA TFO Hogelin could proceed with Luna's interview.

Having carefully examined the demeanor and credibility of Trooper Smith and Special Agent Suchma as they presented their testimony, the Court finds them credible and finds their testimony corroborated by the evidence. Based on the credibility of those witnesses and their testimony, and the contemporaneous documentation indicating that Trooper Smith Mirandized Luna, the Court rejects Luna's claim. The Court denies Luna's motion to exclude his post-arrest statements to law enforcement on the grounds that they were elicited in violation of his constitutional rights.

The Court also rejects Luna's contention that his post-arrest statements were "coerced by police threats and induced by their promises." *See* Def.'s Mot. at 5. The only detail Luna submits to support this contention is cited in his Supplemental Declaration, where he alleges that "a police officer, who told me he used to be with DEA" (presumably Trooper Smith), told Luna cautionary stories about what would happen if he did not cooperate, and promised Luna that he would "put in a good word for [him] with the DEA" if Luna cooperated. *See* R. 114, Supplemental Decl. at ¶¶ 10-13. During the suppression hearing, Trooper Smith addressed Luna's allegations. Trooper Smith acknowledged that he encouraged Luna to cooperate with the DEA, and informed Luna that if he cooperated, he would tell the DEA about Luna's assistance. He unequivocally refuted, however, any allegations that he made promises or guarantees to get Luna to cooperate. Trooper Smith also flatly denied threatening or coercing Luna in any way. Based on the Court's consideration of Trooper Smith's demeanor and credibility, as well as the multiple waivers and agreements that Luna proceeded to sign in which he repeatedly verified

that he was knowingly and voluntarily cooperating with the government with no expectation of reciprocity,[12] the Court rejects Luna's motion to exclude his post-arrest statements on the grounds that they were involuntarily made.

As a final matter, Luna argues that his pre-arrest statements to Trooper Nicholas "occurred as the result of Nicholas's lengthy interrogation of Luna without first advising Luna of his constitutional rights." *See* Def.'s Mot. at 4. Seventh Circuit law holds, however, that "*Miranda* warnings are not required merely because the individual questioned by law enforcement officers is a suspect or is the focus of a criminal investigation. The suspect must be both 'in custody' and subjected to 'interrogation' before the *Miranda* warning(s) are required to be administered." *United States v. Budd*, 549 F.3d 1140, 1145 (7th Cir. 2008) (quoting *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006)). "A custodial interrogation occurs when there is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The "in custody" standard requires a slightly more searching analysis than that required to determine whether a detention has transformed into a formal arrest. "[T]o establish a custodial relationship, a defendant must either show that he was formally arrested, or that he or she was subject to restraints of freedom such that the conditions of a formal arrest were closely approximated or

---

[12] Luna signed a "Written Waiver Of Rights To Be Taken Before A Federal Magistrate And To Have Counsel" at 5:15 p.m. on March 2, 2010. In that Waiver, Luna states that he wishes to give up his right to counsel and to proceed in front of a magistrate, and that he has "thought about this decision very carefully" and "do[es] not need the assistance of a lawyer to advise [him.]" *See* R. 70-4. Luna signed a Confidential Source Agreement at 5:36 p.m. In that Agreement, Luna acknowledges that his assistance to the DEA is "entirely voluntary," that "[t]he DEA does not promise or agree to any consideration by a prosecutor or a court in exchange for [his] cooperation," and that he "understand[s] that [he] ha[s] no immunity or protection from investigation, arrest, or prosecution." *See* R. 70-5, ¶¶ 1, 4, 5.

actually attained." *Lennick*, 917 F.2d at 977.

The Court analyzes the totality of the circumstances to make this determination. *Id.* In considering the totality of the circumstances, the Court assesses "(1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that he was not under arrest and was free to leave; (4) whether the individuals were moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the defendant of documents she needed to continue on her way; and (7) whether the officers' tone of voice was such that their requests would likely be obeyed." *Barker*, 467 F.3d at 628-29 (internal citations omitted). Here, Trooper Nicholas stopped Luna in a public place. Luna consented to speak with Trooper Nicholas, and to the Court's eye, was cooperative and polite throughout the investigation. Trooper Nicholas never verbally or physically threatened Luna, never handcuffed Luna, never put Luna in his patrol car, and never demonstrated any force toward Luna. Trooper Nicholas directed Luna to proceed to a nearby rest stop for purposes of completing his search of the semi-truck, and Luna consented without provocation, driving unaccompanied to the rest stop. Based on the Court's review of these relevant facts, as well as its close inspection of Luna's interaction with Trooper Nicholas in the video recording, the Court finds that Luna was not "in custody" when he initially spoke to Trooper Nicholas before his arrest, and *Miranda* warnings were thus not required. Luna's motion to exclude his pre-arrest statements to Trooper Nicholas is denied.

**CONCLUSION**

For the reasons discussed above, the Court denies Luna's Motion to Quash Arrest and Suppress Evidence and Statements.

**Date:** February 14, 2011

                                          **ENTERED**

                                          _____
                                          **AMY J. ST EVE**
                                          **United States District Court Judge**